**Supreme Court of Kentucky**

2008-SC-000839-DG

FINAL

DATE _Ethel Hicks 12-16-10_

COMMONWEALTH OF KENTUCKY                                    APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                      CASE NO. 2007-CA-000661-MR
FRANKLIN CIRCUIT COURT NO. 02-CI-00837

E. JOHN REINHOLD (D/B/A AMERICAN                         APPELLEES
EVANGELISTIC ASSOCIATION), MEDI-SHARE,
AND CHRISTIAN CARE MINISTRY

**OPINION OF THE COURT BY JUSTICE VENTERS**

**REVERSING AND REMANDING**

We granted discretionary review in this case to address two issues. The first issue is whether Appellees, E. John Reinhold, American Evangelistic Association, The Christian Care Ministry, and their Medi-Share program provide a "contract for insurance" as defined by KRS 304.1-030. The second issue is whether Medi-Share, if determined to be a "contract for insurance" under KRS 304.1-030, falls within the Religious Publications Exemption from Kentucky's Insurance Code under KRS 304.1-120(7).

For the reasons stated below, we conclude that the Medi-Share program does provide a "contract for insurance" as defined by KRS 304.1-030. We also conclude that Medi-Share does not fall within the Religious Publications

Exemption. Thus, we reverse the decision of the Court of Appeals, and remand the cause to the Franklin Circuit Court for entry of an appropriate judgment.

## FACTS

Medi-Share is a program operated by the American Evangelistic Association and the Christian Share Ministry,[1] which advertises itself as a "sharing ministry" providing "Affordable, Biblical Healthcare." Medi-Share calls itself a "sharing ministry" because people voluntarily join the program, according to Appellees, to help pay the medical bills of other members. In return, the people who join Medi-Share are eligible to receive donations from other members to help pay for their own medical expenses. Since Medi-Share does not consider itself insurance, it is not licensed to sell insurance in the Commonwealth, and it avoids other regulatory requirements and oversight to which conventional insurance companies are subject.

Medi-Share offers several different membership plans for singles, couples, and families, each providing different benefits and financial obligations. To join Medi-Share, a prospective member must first fill out an application form and pay a $175.00 fee. The application form serves a dual purpose. First, the form is a way for Medi-Share to review the applicant's information to determine if that person is eligible to join the program. Second, and more importantly, the application form serves as a "commitment" contract whereby the applicant promises to abide by certain Medi-Share rules and

---

[1] E. John Reinhold is the Chairman of the American Evangelistic Association and the Christian Share Ministry.

regulations while participating in the program. These rules and regulations include that the applicant be committed to being a Christian, live by "biblical standards," attend church regularly, not use tobacco or illegal drugs, and refrain from abusing legal substances such as alcohol. The "commitment contract" also places the following responsibility on being a Medi-Share member:

> I understand that I will be responsible each month to access the member website, which identifies a fellow Christian who will be receiving my gift toward their medical need. I will endeavor to pray for this person and to give him or her encouragement by mail. I understand that my fellow believers in Christ are relying upon the receipt of my monthly share by the first of each month.[2]

The "commitment" contract also includes the following disclaimer:

> I understand that Christian Care Ministry (CCM) matches a Medi-Share member's medical need with other Members who have volunteered, in faith, to share in meeting needs through the biblical concept of Christian mutual sharing. I further understand that all money comes from the voluntary giving of Members, not from the Christian Care Ministry, and that the Christian Care Ministry is not liable for the payment of any medical bills. I will accept the decisions made during the Appeal Process by the 'Seven Member Appeal Panel' described in the Guidelines and will bring no suit, legal claim or demand of any sort against CCM for unpaid medical expenses.

The application form expressly states that a Medi-Share contract is not an insurance policy. The disclaimer provides as follows:

---

[2] We note that an application form included in the record which predates the above quoted one used the following language:

> I understand that I will receive notice by the 20th of each month, identifying a fellow Christian who will be receiving my gift toward their medical need that month. I promise to pray for this person and may give him/her full encouragement by phone or mail. Because this fellow Believer-In-Christ is counting on me, [Christian Care Ministry] must get my Monthly Share *by the first of each month.*

3

ATTENTION – This publication is not issued by an insurance company, nor is it offered through an insurance company. This publication does not guarantee or promise that your medical bills will be published or assigned to others for payment. Whether anyone chooses to pay your medical bills is strictly voluntary. This publication should never be considered a substitute for an insurance policy. Whether or not you receive any payments for medical expenses and whether or not this publication continues to operate, you are responsible for payment of your own medical bills.

Similar disclaimers appear throughout Medi-Share's subscriber information, member guidelines, promotional materials, and all periodic publications.

An underwriting manual is used by Medi-Share to review each applicant's information. This manual contains information on pre-existing medical exclusions and other exclusions which can keep a person from being granted membership in Medi-Share. Such exclusions frequently appear in the health insurance industry.

If an applicant is approved to join Medi-Share, the member is issued a membership card, and is expected to pay an annual fee of $150 and to make the monthly "share" payment as stated in the "commitment" contract.[3] Medi-Share calculates the member's monthly "share" by applying underwriting standards and interpreting statistical data to fix the contribution based on anticipated future claims. The member's expected monthly "share" can also be increased by Medi-Share based on that member's previous claims history and an actuarial analysis of risk. A member who is late in paying his monthly "share" is assessed an "extra blessing gifts" penalty. Members who fail to pay

---

[3] The record reflects that according to the Medi-Share website the monthly "share" payments are not tax-deductible.

their monthly "share" within a certain period of time are removed from the Medi-Share program.

The monthly "share" payments are sent directly from the member to Medi-Share. Medi-Share retains a portion of each member's "share" to cover its administrative costs.[4] The remainder of the member's "share" is placed into a trust with sub-accounts designated by individual member. The sub-accounts function in many ways like an escrow account.

When a member has a medical expense, he pays the applicable co-payment to the medical provider, and sends the claim form directly to Medi-Share. Medi-Share's claims adjusters review the claim to see if it is covered under the plan. If the claim is approved to be paid, the payment for the member's medical bills is taken directly from another member's sub-account. Payments of claims are made directly to the medical provider. The determination of which member sub-accounts are used to pay the approved claims is made by Medi-Share. The members have no control over which claims get paid for from their individual sub-account. Thus, a member does not designate any specific recipient of the "donation" from his sub-account. However, the "commitment" contract requires each member to log on to the Medi-Share website each month to see who received the benefit of payments made from his sub-account for that month.

---

[4] At the time of the Franklin Circuit Court trial, about 17 to 20 % of the monthly "share" payments were expended for administrative costs. However, the record reflects that percentage has been reduced since Medi-Share cancelled the stop-loss insurance protection it once held.

Medi-Share has a series of guidelines for its members which define what types of claims will be paid, provide for deductibles, and outline yearly and lifetime caps on benefits each member may receive. The guidelines also encourage the use of medical services within Medi-Share's "Preferred Provider Organization" by providing penalties for the use of out-of-network providers.

The Commonwealth of Kentucky filed suit in the Franklin Circuit Court on June 21, 2002, alleging that Medi-Share, American Evangelistic Association, and the Christian Care Ministry were engaging in the unauthorized sale of insurance. The Circuit Court held a bench trial on October 25-26, 2006, and ruled that Medi-Share is not a "contract for insurance," as defined by KRS 304.1-030, because its programs do not shift the risk of incurring medical charges from its members to itself. The Circuit Court also ruled that KRS 304.1-120(7), the Religious Publication Exception to our Insurance Code, applied to Medi-Share, and thus even if Medi-Share was a "contract for insurance," it nevertheless is not subject to regulation by the Commonwealth.

The Court of Appeals, in a divided opinion, affirmed the Franklin Circuit Court ruling that Medi-Share was not insurance. However, while the majority opinion stated that the Religious Publication Exemption in KRS 304.1-120(7) applied to Medi-Share, in actuality two of the three judges on the panel believed that Medi-Share did not qualify for that exception, and thus the majority view of the panel was that Medi-Share did not satisfy the requirements for the Religious Publication Exemption.

For the reasons set forth below, we now reverse the decision of the Court of Appeals, and remand to the trial court for entry of a judgment consistent with this opinion.

## I. MEDI-SHARE IS A CONTRACT FOR INSURANCE
## AS DEFINED BY KRS 304.1-030

The primary issue in this case is whether Medi-Share provides a contract for insurance as defined by KRS 304.1-030. KRS 304.1-030 defines insurance as "a contract whereby one undertakes to pay or indemnify another as to loss from certain specified contingencies or perils called 'risks,' or to pay or grant a specified amount or determinable benefit or annuity in connection with ascertainable risk contingencies, or to act as surety."

We begin by noting that this case was tried by the circuit court sitting without a jury. It is before this Court upon the trial court's findings of fact and conclusions of law and upon the record made in the trial court. Accordingly, appellate review of the trial court's findings of fact is governed by the rule that such findings shall not be set aside unless clearly erroneous. A factual finding is not clearly erroneous if it is supported by substantial evidence. *Owens-Corning Fiberglas Corp. v. Golightly*, 976 S.W.2d 409, 414 (Ky. 1998); *Uninsured Employers' Fund v. Garland*, 805 S.W.2d 116, 117 (Ky. 1991). Substantial evidence is evidence, when taken alone or in light of all the evidence, has sufficient probative value to induce conviction in the mind of a reasonable person. *Golightly*, 976 S.W.2d at 414; *Largent v. Largent*, 643 S.W.2d 261 (Ky.

1982); CR 52.01. The trial court's conclusions of law, however, are subject to independent de novo appellate determination. *A & A Mechanical, Inc. v. Thermal Equipment Sales, Inc.*, 998 S.W.2d 505, 509 (Ky. App. 1999).

Both lower court decisions correctly concluded that the shifting of risk from one party to another was a necessary component of an insurance contract. The United States Supreme Court agrees with this principle, describing insurance as, "an arrangement for transferring and distributing risk." *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 211 (1979). The lower court decisions, however, incorrectly determined that the Medi-Share program did not shift risk because each individual member remains personally liable for paying his own medical bills. We note that even under conventional health insurance plans a member remains personally liable to the medical provider for payment. Key to the Court of Appeals decision were the uncontroverted facts that Medi-Share disclaimed any liability for members' medical expenses and guaranteed payment of no claims, that Medi-Share informed its members that it was not a substitute for insurance, that any medical bill payments were considered voluntary donations from other members, and that Medi-Share does not pay member claims, but, rather, claims are paid by the transfer of money from one member's sub-account to another, and from there sent to the medical care provider.

However, the lower court opinions overlook the risk-shifting nature of the "commitment" contract that members enter into when they become a part of

the Medi-Share program, and thus the lower courts erroneously concluded that the process does not constitute a "contract for insurance" as defined by KRS 304.1-030. As discussed below, the Medi-Share program fits comfortably within the statutory definition of an insurance contract.

In reviewing the "commitment" contract to evaluate whether it is a contract for insurance, we note that its wording, standing alone, is not controlling.

> It is immaterial, or at least not controlling, that the term "insurance" nowhere appears in the contract the nature of which is to be determined; indeed, the fact that it states that it is not an insurance policy is not conclusive, and a company may be found to be engaged in an insurance business even though it expressly disclaims any intention to sell insurance. Neither are the terms or mode of payment of the consideration determinative of the question whether the contract is one of insurance. The nature of a contract as one of insurance depends upon its contents and the true character of the contract actually entered into or issued – that is, whether a contract is one of insurance is to be determined by a consideration of the real character of the promise or of the act to be performed, and by a consideration of the exact nature of the agreement in light of the occurrence, contingency, or circumstances under which the performance becomes requisite, and not by what it is called.

43 Am.Jur.2d *Insurance* §4 (1982) (footnotes omitted); *see also Barberton Rescue Mission, Inc. v. Insurance Division of the Iowa Department of Commerce*, 586 N.W.2d 352 (Iowa 1999). It is the actual nature and effect of the "commitment" contract that determines whether it is one for insurance. *See Wheeler v. Ben Hur Life Ass'n.*, 264 S.W.2d 289, 291 (Ky. 1953) ("Broadly speaking . . . when a company, society, or association, either voluntary or incorporated, and known as a relief, benevolent or benefit society, or by some

similar name, contracts for a consideration to pay a sum of money upon the happening of a certain contingency, and the prevalent purpose and nature of the organization is that of insurance, it will be regarded as an insurance company, and its contracts as insurance contracts, regardless of the manner or mode of payment of consideration or of loss or benefit"); *Allin v. Motorists' Alliance of America*, 234 Ky. 714, 29 S.W.2d 19, 23 (1930) (holding that one cannot change the nature of insurance business by declaring in the contract that it is not insurance).

The "commitment" contract, as previously quoted, obligates Medi-Share members to pay their monthly "share" by the first of each month because their "fellow believers in Christ" *rely* upon that payment to satisfy their medical needs. In return for paying their monthly "share," Medi-Share members remain eligible to receive payment for their medical needs through the program. This process clearly shifts the risk of payment for medical expenses from the individual member to the pool of sub-accounts from which his expenses will be paid. Thus, regardless of how Medi-Share defines itself or what disclaimers it includes in its literature, in the final analysis, there is a shifting of risk.

Moreover, as Medi-Share's advertising materials tout, all members' medical needs have thus far been satisfied through the program. This level of success in paying claims, the record reflects, is due to Medi-Share, using actuary tables, and setting each member's monthly "share" at a level

commensurate with anticipated future member medical claims. Medi-Share utilizes statistical actuarial tables to shift risk the same way a traditional health insurance company sets its premiums. Clearly, this arrangement entered into via the "commitment" contract shifts risk between Medi-Share members in the same manner traditional health insurance contracts shift risk between policyholders.

Thus, through the "commitment" contract Medi-Share's members "undertake[] to pay or indemnify another as to loss from certain specified contingencies or perils called 'risks'." KRS 304.1-030. Further, Medi-Share "undertakes" to actually pool the members' monthly "shares" together and pay the actual medical bills as claims for payment are submitted. Thus, the "commitment" contract is, in practice and function, one for insurance.

Medi-Share argues, however, that the disclaimer in the "commitment" contract which states that Medi-Share takes no responsibility for the payment of the members' medical bills indicates that no risk shifting occurs. Nevertheless, this disclaimer, while perhaps shielding Medi-Share from any liability for its members' medical bills, does not overcome the fact that through the Medi-Share program the individual members pool resources together to distribute the risk of major medical bills amongst each other. As previously stated, one cannot change the nature of an insurance business by simply declaring in the contract that it is not insurance. *Allin*, 29 S.W.2d at 23.

Medi-Share also argues that a member who joins their program is

11

actually undertaking a charitable endeavor and not attempting to shift risk. Medi-Share compares a member's participation in their program to one who throws a dollar into a fireman's boot during the annual WHAS Crusade for Children, or makes a monthly donation to the United Way. The facts presented do not support this contention. A person in the above examples generally provides his or her gift altruistically. The giver receives no financial benefit from the gift. The only direct benefit is the joy derived from helping a person in need or supporting a worthy cause. While we do not doubt the claim that Medi-Share members are altruistically inspired, neither do we doubt that they pay "shares" with the expectation of a financial return based on Medi-Share's history of claims payments in the form of the payment of their own medical bills.

Medi-Share's advertising, examples of which are included in the record, supports this conclusion. Medi-Share advertisements call itself an "alternative to expensive health insurance [which] could save [its members] $2,000 to $4,000 a year or more." If one does qualify for Medi-Share one "enjoy[s] significant savings." Further, member testimonials tout the monetary amount of their medical bills which were paid through Medi-Share and make claims such as "the medical bills would have destroyed us financially, except for Medi-Share." If Medi-Share was a pure charity, it is doubtful that its advertising would focus so heavily on the personal benefits one can receive by becoming a member. Indeed, the thrust of the advertising is that it is an economical

12

alternative to conventional heath insurance programs. The conclusion that

Medi-Share functions not as a charity, but as a type of insurance is well

supported by the evidence in the record.

## II. MEDI-SHARE DOES NOT QUALIFY FOR THE RELIGIOUS PUBLICATION EXCEPTION PROVIDED IN KRS 304.1-120(7)

Medi-Share argues that if it is found to be a "contract for insurance" it is

still exempt from state regulation because it qualifies for the Religious

Publication Exception from the Kentucky Insurance Code provided by KRS

304.1-120(7). KRS 304.1-120(7) states:

> No provision of [the Kentucky Insurance Code] shall apply to . . .
>
> (7) A religious publication (as identified in this subsection), or its subscribers, that limit their operations to those activities, and:
>
> > (a) Is a non-profit religious organization;
> >
> > (b) Is limited to subscribers who are members of the same denomination or religion;
> >
> > (c) Acts as an organizational clearinghouse for information between subscribers who have financial, physical, or medical needs and subscribers who choose to assist with those needs, matching subscribers with the present ability to pay with subscribers with a present financial or medical need;
> >
> > (d) Pays for the subscribers' financial or medical needs by payments directly from one (1) subscriber to another;
> >
> > (e) Suggests amounts to give that are voluntary among the subscribers, with no assumption of risk or promise to pay either among the subscribers or between the subscribers and the publication; and
> >
> > (f) Provides the following verbatim written disclaimer as a separate cover sheet for all documents distributed by or on behalf of the exempt entity, including all applications,

guidelines, promotional or informational materials, and all periodic publications:

> 'This publication is not issued by an insurance company nor is it offered through an insurance company. This publication does not guarantee or promise that your medical bills will be published or assigned to other for payment.
> Whether anyone chooses to pay your medical bills will be totally voluntary. This publication should never be considered as a substitute for an insurance policy.
> Whether you receive any payments for medical expenses, and whether or not this publication continues to operate, you will always remain liable for any unpaid bills.'

It is clear from the statutory language of KRS 304.1-120(7) that for Medi-Share to qualify for the Religious Publications Exception, it must meet every criterion listed. *Harris v. Commonwealth*, 793 S.W.2d 802, 809 (Ky. 1990) ("This conclusion is inescapable because otherwise the General Assembly would have used the disjunctive 'or' instead of the conjunctive 'and'"). Medi-Share does not.

Subsection (d) requires that the publication subscribers' needs be paid "directly from one (1) subscriber to another." Therefore to satisfy the requirement of subsection (d), the religious publication must be set up so that one subscriber sends the money for assistance to the other subscriber without having the money passing through an intermediary. Medi-Share does not operate in this manner. Medi-Share serves an intermediary by which monthly "shares" from members are collected and held until being used to pay other members' needs. Medi-Share determines which needs are paid, how they are

14

paid, and when they are paid. Each "subscribers' needs" are thus not paid directly from one subscriber to another, but through Medi-Share. Since Medi-Share does not satisfy KRS 304.1-120(7)(d), it does not qualify for the Religious Publication Exception.

## CONCLUSION

For the above stated reasons, the opinion of the Court of Appeals is reversed, and the cause is remanded to the Franklin Circuit Court for entry of a judgment consistent with this opinion.

All sitting. Minton, C.J., Abramson, Noble, Schroder, JJ., concur. Scott, J., dissents by separate opinion in which Cunningham, J., joins.

COUNSEL FOR APPELLANT:

Jack Conway
Attorney General
Room 118, Capitol Building
Frankfort, Kentucky 40601

Stephan L. Taylor
Special Assistant Attorney General
215 West Main Street
P O Box 517
Frankfort, Kentucky 40602-0517

COUNSEL FOR APPELLEE:

Brent L. Caldwell
Boehl, Stopher and Graves
444 West Second Street
Lexington, Kentucky 40507

Richard Lynn Masters
Masters, Mullins & Arrington
1012 South Fourth Street
Louisville, Kentucky 40203

COUNSEL FOR AMICUS CURIAE - KENTUCKY JUSTICE ASSOCIATION

Kevin Crosby Burke
125 South Seventh Street
Louisville, Kentucky 40202-2703

H. Philip Grossman
Grossman & Moore, PLLC
401 West Main Street, Ste 1810
Louisville, Kentucky 40202

# Supreme Court of Kentucky

### 2008-SC-000839-DG

COMMONWEALTH OF KENTUCKY                                              APPELLANT


ON REVIEW FROM COURT OF APPEALS
V.                          CASE NO. 2007-CA-000661-MR
FRANKLIN CIRCUIT COURT NO. 02-CI-00837


E. JOHN REINHOLD (D/B/A AMERICAN                                     APPELLEES
EVANGELISTIC ASSOCIATION), MEDI-SHARE,
AND CHRISTIAN CARE MINISTRY


## DISSENTING OPINION BY JUSTICE SCOTT

I do not believe that Medi-Share is in the business of insurance and I

further disagree that the Medi-Share contract falls within the ambit of

definitional insurance as outlined in KRS 304.1-030. Furthermore, because I

believe that the activities of Medi-Share should be sheltered by the Religious

Publication Exemption as provided for by the General Assembly in KRS 304.1-

120(7), I respectfully dissent from the Court's opinion.

### I. Medi-Share is Not in the Business of Insurance

As noted by the Court of Appeals, the United States Supreme Court has

described insurance as, "an arrangement for transferring and distributing

risk." *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211 (1979).

Additionally, our federal counterpart has identified three criteria that indicate

that a company is in the "business of insurance": (1) whether the practice has

the effect of transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry. *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 743 (1985). I interpret these opinions like the Court of Appeals and agree with its view that "[c]entral to the United States Supreme Court's analysis of the 'business of insurance' is the distribution of risk between the policy holder and the insurer." Because the relationship between Medi-Share and its subscribers does not amount to a distribution of risk between the policy holder (the subscribers) and Medi-Share (the conduit to the pool of subscribers), I do not believe Medi-Share to be in the business of insurance as described by the United States Supreme Court. Rather, I believe that the system set up by Medi-Share shifts the risk from one subscriber (the insured) to the pool of subscribers (the insurers) that is controlled and managed by Medi-Share. Thus, while Medi-Share is in the business of promoting and managing a cost-sharing organization, it is not in the business of insurance itself.

The crux of my position is based on the fact that Medi-Share bears no risk when it admits a member to the pool. That risk is carried by the members of the pool—not Medi-Share. This conclusion derives from a plain meaning of

2

the commitment contract submitted by Medi-Share to new members.[1] That contract states that Medi-Share takes no responsibility for the payment of the members' medical bills. And as recognized by the majority, that provision likely shields Medi-Share from any liability for its members' medical bills. This begs the question: what risk does Medi-Share, as an entity, bear? The answer is clearly none. However, the majority reasons that the contract language alone does not overcome "the fact that *through* the Medi-Share program the individual members pool resources together to distribute the risk of major medical bills *amongst each other.*" (emphasis added). I whole-heartedly agree with this statement, but believe that this does not support a legal finding that Medi-Share is in the business of insurance, but rather that Medi-Share is in the business of administrating and managing a cost-sharing organization on behalf of others—in this instance, people of faith. In contrast, a true insurance company takes on risks and the company itself bears those risks, not the individually insured policy holders.

---

[1] As noted by the majority, Medi-Share employs a type of disclaimer which attempts to negate any connotation that it is an insurance company. However, the majority discards this disclaimer under the guise that Medi-Share's function overrides the contract language and the Court essentially finds that Medi-Share is an insurance company under a "substance" analysis, if not by "form." However, the General Assembly of Kentucky promulgated and requires this disclaimer when religious institutions attempt to create these cost-sharing organizations. See KRS 304.1-120(7)(f). And while I believe that an insurance company may not disclaim its insurance function simply by employing a disclaimer in its policies, I also recognize that the General Assembly, in passing this statute, considers the disclaimer more pertinent than a normal one used by a non-religious institution. Otherwise, sub-section (f) becomes superfluous, and will be read as an irrelevant section of Kentucky law.

What's more, I believe that Medi-Share's contract does not meet the definition of insurance as promulgated by the legislative authority in this Commonwealth. The General Assembly of Kentucky has defined insurance as:

> "[A] contract whereby one undertakes to pay or indemnify another as to loss from certain specified contingencies or perils called "risks," or to pay or grant a specified amount or determinable benefit or annuity in connection with ascertainable risk contingencies, or to act as surety."

KRS 304.1-30. In order for Medi-Share to fit this definition, it would have to undertake to pay or indemnify another for risks, or to pay or grant a specified amount or to act as a surety. Like the majority opinion of the Court of Appeals, I believe Medi-Share does none of these, but rather, these activities are assumed by the members of the pool, since each of them agrees to pay for the other's losses in exchange for other members paying for their losses. Had Medi-Share agreed to pay the losses from their funds or pooled the subscribers' funds into one pool, I would agree that Medi-Share's contract is in fact definitional insurance. But Medi-Share simply does not do this.

Moreover, I admit that Medi-Share has extraordinary control over the funds and I also acquiesce to the majority's position that Medi-Share's decision-making abilities tend to lean toward finding that it is in the business of insurance. But my concerns are resolved by the fact that, at the end of the day, the individual sub-pools of subscribers bear the risks and not Medi-Share. And with regard to the extraordinary control exercised by Medi-Share, I believe it to be no more than a proper delegation of a duty. Such a delegation is necessary so that the subscribers are not overburdened with making

4

administrative decisions (including who gets what and when). Otherwise, the benefits of this cost-sharing organization would likely transform into an administrative encumbrance upon its subscribers. Moreover, as discussed below, I believe this type of management and delegation of authority is contemplated in KRS 304.1-120(7)(c) and that the actions of the Medi-Share administrators comply with the spirit of this rule.

## II. If Medi-Share Is An Insurance Company, It Should Fall Under the Religious Publication Exemption As Outlined in KRS 304.1-120(7).

Additionally, I believe that Medi-Share substantially complies with the provisions outlined in KRS 304.1-120(7) and therefore would consider it exempt from state regulation.

Under KRS 304.1-120(7), no provision of [the Kentucky Insurance Code] shall apply to:

> (7) A religious publication (as identified in this subsection), or its subscribers, that limit their operations to those activities permitted by this subsection, and:
>
> (a) Is a nonprofit religious organization;
>
> (b) Is limited to subscribers who are members of the same denomination or religion;
>
> (c) Acts as an organizational clearinghouse for information between subscribers who have financial, physical, or medical needs and subscribers who choose to assist with those needs, matching subscribers with the present ability to pay with subscribers with a present financial or medical need;
>
> (d) Pays for the subscribers' financial or medical needs by payments directly from one (1) subscriber to another;
>
> (e) Suggests amounts to give that are voluntary among the subscribers, with no assumption of risk or promise to pay

5

either among the subscribers or between the subscribers and the publication; and

(f) Provides the following verbatim written disclaimer as a separate cover sheet for all documents distributed by or on behalf of the exempt entity, including all applications, guidelines, promotional or informational materials, and all periodic publications:

> "This publication is not issued by an insurance company nor is it offered through an insurance company. This publication does not guarantee or promise that your medical bills will be published or assigned to others for payment. Whether anyone chooses to pay your medical bills will be totally voluntary. This publication should never be considered as a substitute for an insurance policy. Whether you receive any payments for medical expenses, and whether or not this publication continues to operate, you will always remain liable for any unpaid bills."

In denying Medi-Share the protection outlined in KRS 304.1-120(7), the majority makes much of sub-section (d), and particularly the fact that the subscribers of Medi-Share do not make payments directly to and from one another. The majority concludes that because the payments pass through an "intermediary" (Medi-Share), the payments fall short of being direct and thus finds the protections of KRS 304.1-120(7) undeserved. Common sense and the record before this Court demand that I recognize this procedure as a matter of fact. However, contrary to the holding of the majority, that procedure does not force the conclusion that the payments are not directly made from one subscriber to another.

I am of the opinion that the intermediary in this case (Medi-Share) acts in a similar fashion as a trustee, a bank, an attorney, or an agent. Had the

6

subscribers mailed their payments or instructed an agent to make the payment on their behalf, would the Court reach the same conclusion because the payment passed through a third party before reaching the intended beneficiary? I think the answer is clearly no. Thus, my thoughts on the matter are that Medi-Share is a conduit rather than an intermediary. Certainly, this Court would not hold that simply because one acts through an agent or via a trustee that one has not acted in a direct manner. Indeed, under the law controlling the principles of agency in this Commonwealth, we impugn upon the principal the acts of its agents as "if they proceeded *directly* from the principal." *See Preferred Risk Fire Ins. Co. v. Neet*, 90 S.W.2d 39, 42 (Ky. 1935) (*citing Union Mut. Ins. Co. v. Wilkinson*, 80 U.S. 222 (1871) (emphasis added). Medi-Share's function is no different, and the subscriber's payments are no less direct because they first pass through Medi-Share.

It bears repeating that the extent of control that Medi-Share exercises in this case might set it apart from what is contemplated in KRS 304.1-120(7). However, I again analogize the actions of Medi-Share to that of an agent to principal relationship, whereby the agent (Medi-Share) is given discretionary authority to act on behalf of its principal (the subscribers). That discretion, however, should not make the actions any less direct. Furthermore, I believe this delegation and discretion is expressly contemplated by KRS 304.1-120(7)(c) which recognizes and allows the administration of these type of cost-sharing organizations to "match[] subscribers with the present ability to pay

7

with subscribers with a present financial or medical need." It seems to me that is exactly what we have here.

I am of the opinion that Medi-Share is in substantial compliance with KRS 304.1-120(7) and the spirit of that rule. I would not strip that organization of the protections outlined in KRS 304.1-120(7) simply because payments are made at the direction of Medi-Share after subscribers have delegated this duty to Medi-Share, particularly when Medi-Share already statutorily possesses the authority to function in an administrative capacity.

For the foregoing reasons, I respectfully dissent from the majority's opinion in this matter.

Cunningham, J., joins.