DEANS & HOMER, INC., Appellant

v.

COMMONWEALTH of Kentucky, PUBLIC PROTECTION CABINET, KENTUCKY DEPARTMENT OF INSURANCE; and Sharon P. Clark, in her Capacity as Commissioner, Kentucky Department of Insurance, Appellees.

No. 2012–CA–000012–MR.

Court of Appeals of Kentucky.

Jan. 31, 2014.

Discretionary Review Denied by Supreme Court Feb. 11, 2015.

Sheryl G. Snyder (argued), Jason P. Renzelmann, Louisville, KY, Greg E. Mitchell, Kyle Melloan, Lexington, KY, for appellant.

**660**

Stephen L. Taylor, Public Protection Cabinet Office of Legal Services Insurance Legal Division, Frankfort, KY, for appellees.

James T. Lobb, Russell H. Saunders, Louisville, KY, Amicus Curiae brief of Store–All Winchester Road, LLC and Storage Mart MO, LLC.

Before ACREE, CHIEF JUDGE; LAMBERT and MAZE, Judges.

## OPINION

ACREE, Chief Judge:

The appellant, Deans & Homer, Inc., appeals the Franklin Circuit Court's opinion and order affirming an administrative determination of the Kentucky Department of Insurance that the appellant had engaged in the promotion of an unauthorized insurance policy. The circuit court also rejected appellant's argument that the Department had violated Kentucky Revised Statutes (KRS) 304.14–130 by failing to follow the procedure for withdrawing approval of a previously approved form of insurance. Because we find the appellant did not promote an unauthorized insurance product, we reverse.

## I. Background

The facts giving rise to this appeal present the story of how the self-storage industry addressed a plight that, on occasion, befalls unwitting self-storage unit customers—that plight is the often unrecoupable loss customers suffer when their stored property is damaged or destroyed.

▪ It begins with the appellant's (and apparently the industry's) belief that "[s]elf-storage operators are generally not legally liable for loss or damage to their customers' stored property."[1] To eliminate debate regarding this legal question, owners/operators[2] include exculpatory provisions in their rental agreements. The self-storage unit rental agreement filed in the record as an example includes such a provision as follows:

> OWNER and OWNER'S agents and employees [i.e., operators] shall not be liable for any loss or damage to any personal property at the self-storage facility arising from any cause whatsoever including, but not limited to, burglary, theft, mysterious disappearance, fire, water damage, rodents, Acts of God, the active or passive acts or omissions of the OWNER, OWNER'S agents or employees, and CUSTOMER releases OWNER for all such liability.

---

1. The appellant's belief in this legal postulate is not disputed and that is all that is important in setting forth the facts. Whether that belief is legally correct is not in issue. But, lest this opinion be misunderstood, we clarify that we do not disagree with the appellant's assertion, as qualified, that "operators are *generally* not legally liable for loss or damage to their customers' stored property." However, while the "general rule in effect in Kentucky, is that a tenant takes premises as he finds them[,]" *Miles v. Shauntee*, 664 S.W.2d 512, 518 (Ky.1983), there are exceptions. For example, a landlord may be liable to a tenant for a defective condition of leased premises (such as a storage unit) if "the condition [causing the damage] is unknown to the tenant and not discoverable through reasonable inspection." *Miller v. Cundiff*, 245 S.W.3d 786, 788 (Ky.App.2007). Additionally, "the law implies a covenant for quiet enjoyment ... obligating lessor to ... protect[ ] his lessee from interference with the latter's use and enjoyment of the premises...." *Evans v. Williams*, 291 Ky. 484, 165 S.W.2d 52, 56 (1942). Therefore, it would be more accurate to say that a self-storage operator's potential liability is limited, but he is not completely immune from liability, and certainly not immune from suit *attempting* to impose liability.

2. The terms "owners" and "operators" are used interchangeably in the record and, therefore, in this opinion.

(Hearing Exhibit 13). The appellant's witnesses testified that such provisions are standard in self-storage unit rental agreements.[3]

These rental agreements also typically include another provision requiring the customer to obtain insurance to protect them from losses resulting from damage to their personal property stored in the operator's unit. Testimony offered by the appellant indicated that the vast majority of customers (98%–99%) fail to comply with this requirement and therefore must bear any loss out of their own pockets.

According to unrefuted testimony, when these uninsured losses occur, the individual operator's reputation suffers, as well as that of the industry as a whole. The industry considered this a problem and undertook efforts to solve it. Enter the appellant.

The appellant is a managing general agent that markets insurance products for the QBE Insurance Company in Kentucky[4] and sells insurance to operators of self-storage facilities.

The appellant's solution was rather simple—amend the storage rental agreement so that the risk of loss, which the base contract's exculpatory provision placed entirely on the customer, is partially re-allocated to the operator when the damage occurs as a result of the operator's actions. A short addendum to the existing rental contract would suffice. The appellant[5]

crafted a sample provision which Kentucky operators could add to their existing rental agreements and captioned the addendum the "Customer Storage Protection Plan— Owner's Limited Assumption of Liability." Its body read as follows:

> In consideration of payment of $_____ in additional monthly rent, Owner waives the release of liability for property damage in paragraph ____ [of the primary rental agreement, *i.e.*, the exculpatory provision] up to the amount indicated below. Participation in the Protection Plan also fulfills your obligation to insure your stored property required by the rental agreement. Owner shall only be liable for losses that occur as a result of Owner's negligence or as a result of acts or omissions for which Owner is liable under the law, including but not limited to vicarious liability, intentional tort, strict liability, and breach of common law or statutory duty. Owner's liability will arise only if Owner is negligent or breaches some other duty to you and there is a loss of or damage to your stored property.
>
> ... The most the Owner will pay for loss of or damage to your property under this plan is $_____. This is the most the Owner shall pay for any loss for any reason....

This provision effectively rescinded or waived a negotiated portion of the exculpatory clause of the base rental agreement in exchange for a negotiated additional

---

3. We also note the recent article in the Tennessee Law Review which states "standard self-storage rental agreements invariably place all risk of loss or damage upon tenants." Jeffrey Douglas Jones, *Property Rights, Property Wrongs, and Chattel Dispossession Under Self–Storage Leases*, 78 Tenn. L.Rev. 1015, 1022 (2011).

4. "A 'managing general agent' is an individual or business entity appointed by an insurer to solicit applications from agents for insur-

ance contracts or to negotiate insurance contracts on behalf of an insurer and, if authorized to do so by an insurer, to effectuate and countersign insurance contracts." KRS 304.9–085(1). A managing general agent must be licensed by the Kentucky Department of Insurance. KRS 304.9–085(2).

5. We assume the appellant engaged the services of an attorney to draft the language of the form addendum to the form contracts.

monthly rental payment. We note that in this sample addendum the operator does not assume any risk of loss for damage to the customer's property that could not be attributed to the operator's conduct. Therefore, the effect of the addendum is simply to re-establish what the exculpatory language of the contract had eliminated— the customer's right to bring a claim against the operator if the operator "is negligent or breaches some other duty to" the customer that results in damage to the stored property (as it is stated in the addendum).

This created another problem. If this addendum applied, the storage unit operator would have to pay out of pocket for the damage he caused to his customer's property. But there was a solution to that problem, too. The risk could be insured.

The appellants, being in the insurance business, had a product to cover precisely such risks; the product is known generally in the industry as a "Contractual Liability Insurance Policy," or "CLIP." The specific CLIP the appellants designed for the storage unit industry was identified to the Department as the Storage Operators Contract Liability Program.

Appellants plainly described the industry's problem and the overall concept for solving it for presentation to the Kentucky Department of Insurance so that the insurance component, the Storage Operators Contract Liability Program policy, *i.e.*, the CLIP, could be approved. They named the overall concept after the caption of the addendum crafted for use with existing industry form contracts, calling it the Customer Service Protection Plan (CSPP). It was described in the Rate Manual appellant submitted to the Department as follows:

> Self-storage operators are generally not legally liable for loss or damage to their customers' stored property. The operator generally does not have control of the stored property[,] and bailment is not created in the typical self-storage rental transaction. The program is intended to allow the voluntary acceptance of liability by the operator. The actual terms and conditions of the contract between the owner (lessor) and the customer (lessee) are not pre-determined by this program. The operator is free to draft [its] contract and accept responsibility for loss or damage to stored property from such causes and occurrences as the operator believes to be appropriate for [its] level of tolerance for his business risk. This product [the Storage Operators Contract Liability Program policy, the CLIP,] provides a method of containing the loss exposure of this risk transfer by insuring the operator's liability for damage arising from certain causes of loss that have been identified as potentially catastrophic and which would otherwise prohibit the self-storage operation of accepting this risk on behalf of [its] customer.

(Appellant's brief, Appx. E).

We note that the program concept does not require or presume that the form addendum would be used. As appellants explained to the Department, the terms of the storage unit lease agreement "are not pre-determined by this program [and t]he operator is free to draft [its] contract ... as the operator believes to be appropriate[.]" (*Id.*). In other words, an operator could create and negotiate its own addendum. Furthermore, an operator could even redraft its entire contract from the ground up, melding the exculpatory clause in the base contract with the concept in the addendum that partially waived it, in order to suit what "the operator believes to be appropriate for [its] level of tolerance for his business risk." (*Id.*). This would eliminate the addendum entirely which, of

course, would impact the Department's argument that the addendum is a contract of insurance. We will revisit this concept in our analysis.

Based on this Rate Manual submission, the Department approved the appellant's CLIP in 2003.

With the Department's approval in hand, the appellant approached storage unit operators and explained the program concept. If, by use of an addendum or otherwise an operator waived a portion of the exculpatory provision that insulated him from liability for his own negligence, thereby re-establishing an insurable risk, it could purchase the Storage Operators Contract Liability Program policy, the CLIP, to cover that risk. Some operators took advantage of the program, started using risk-of-loss-shifting addenda, and purchased the CLIP.

In April of 2008, the Department received a letter of inquiry from one of the appellant's competitors. The competitor had become aware of the appellant's program and wanted permission to administer a similar one. Following a preliminary review, the Department became concerned the appellant had been marketing an unauthorized insurance product—not the CLIP which had been approved, but the CSPP, the storage unit rental agreement addendum. The Department issued a cease and desist order and requested additional information from the appellant regarding the CSPP.

The appellant requested an evidentiary hearing to resolve the matter. After considering evidence presented by the appellant and the Department, the hearing officer entered a recommended order affirming the Department's conclusion that the CSPP was unauthorized insurance being wrongfully promoted by the appellant. The Commissioner of the Department of Insurance affirmed the recommended order in its entirety.

Appeal to the Franklin Circuit Court was unsuccessful. The circuit court concluded the CSPP constituted an unauthorized contract for insurance and furthermore was not persuaded that the Department's order had violated KRS 304.14–130, the statute that sets out the process for withdrawing approval of a previously approved form of insurance.

This appeal ensued. The first of two questions presented is whether the Department correctly determined that the CSPP, the addendum, was an unauthorized contract of insurance. The second question, which is mooted if we find for the appellants on the first, is whether the Department tacitly approved the CSPP as a form of insurance in 2003, thereby compelling the Department to proceed in accordance with KRS 304.14–130 to withdraw approval, which the Department failed to do.

## II. Standards of review

The standards governing review of an agency's decision have been repeated often:

> An agency decision must be affirmed unless the agency acted arbitrarily or outside the scope of its authority, applied an incorrect rule of law, or if the decision itself is not supported by substantial evidence in the record. When reviewing issues of law, the court's review is *de novo* without any deference to the agency. However, the court's review of factual issues is limited to an inquiry of whether the agency's decision was supported by substantial evidence or whether the decision was arbitrary or unreasonable.

*Department of Labor v. Hayes Drilling, Inc.*, 354 S.W.3d 131, 134–35 (Ky.App.2011) (citations and quotations omitted).

Whether the policy at issue is insurance as defined by KRS 304.1–030 is question of law reviewed *de novo. Osborne v. Commonwealth,* 185 S.W.3d 645, 648 (Ky.2006). The existence of procedural errors, and interpretation of the statutes which establish the appropriate procedures, are likewise questions of law. *See id.*

### III. Discussion

### A. Whether the CSPP, the contract addendum, was insurance

■ The appellant first contends the Department incorrectly determined that the CSPP, the contract addendum, constitutes a contract of insurance. The appellant asserts two bases upon which this Court could conclude it is not: (1) the addendum is nothing more than a risk-of-loss contract provision partially waiving the standard exculpatory clause of self-storage rental agreements and not a separate contract of indemnity; and (2) the risk, although re-allocated from the customer to the operator, is not distributed among a pool of insureds. According to these arguments, the CSPP would not meet the statutory definition of insurance.

The Department interprets the addendum as something more than the product of two parties exercising their freedom to contract. Rather, the Department takes the position that the contract provision constitutes a contract for insurance which has the effect of transferring and distributing the risk of loss among more parties than those who sign the rental agreement.

We conclude that the Department has interpreted the governing statute too broadly. We are persuaded by both of appellant's arguments on this issue. When parties decide to enter into a con-

tract, such as a contract to rent self-storage space, they risk the possibility that their enterprise will not go as anticipated. That risk can be allocated between the parties as they see fit to negotiate. Despite the Department's labeling of this provision as an insurance contract, it is, in fact, a provision that memorializes that negotiation. It re-allocates a risk that the base rental agreement places entirely on the customer. That is not insurance; rather, it is a kind of risk-of-loss provision, in this case one that waives the operator's previously negotiated exculpation.

■ Generally, "[a]n insurance policy is a contract of indemnity[.]" *Buck Run Baptist Church, Inc. v. Cumberland Sur. Ins. Co., Inc.,* 983 S.W.2d 501, 504 (Ky. 1998). "[A]n indemnity contract creates a direct, primary liability between the promisor and promisee that is *original and independent of any other obligation." Intercargo Ins. Co. v. B.W. Farrell, Inc.,* 89 S.W.3d 422, 426 (Ky.App.2002)(original emphasis omitted; emphasis added). Additionally, "[a]n insurer expects losses, and they are actuarially predicted. The cost of such losses are [sic] spread through the market by means of a premium." *Buck Run Baptist Church,* 983 S.W.2d at 504–05. That is to say, "insurance contracts shift risk [among] policyholders." *Commonwealth v. Reinhold,* 325 S.W.3d 272, 277 (Ky.2010).

An example of an insurance contract possessing these characteristics, yet one not approved by the Department, can be found in the case of *Commonwealth v. Reinhold.*[6] The unapproved insurer in that case was Christian Care Ministry (CCM), doing business as "Medi–Share,"

---

6. In fact, the Department asserts that the appellant's program concept "as a contract of risk-sharing reads as the epitome of the holding in" *Reinhold.* (Appellee's brief, p. 5). A

simple reading of *Reinhold* is enough to convince us that such a statement is more than an exaggeration.

which was also the name given the insurance product. *Id.* at 273. "Members" applied in writing to CCM to acquire Medi–Share. If they were accepted, CCM originated "commitment contracts" that stood independently of, and unrelated to, any other agreement. *Id.* at 273–74. Members paid premiums called "shares"; these shares were calculated "by applying underwriting standards and interpreting statistical data to fix the contribution based on anticipated future claims." *Id.* at 275. The shares were sent to Medi–Share which took out administrative costs and the remainder was pooled in a trust account from which members' claims were paid. *Id.* "[T]hrough the Medi–Share program the individual members pool resources together to distribute the risk of major medical bills amongst each other." *Id.* at 278. Medi–Share "provide[d] for deductibles, and outline[d] yearly and lifetime caps on benefits[,]" and identified its "Preferred Provider Organization"—a group of in-network medical providers. *Id.* at 275.

Another example can be found in the case of *Scott v. Louisville Bedding Co.,* 404 S.W.3d 870 (Ky.App.2013). In *Scott,* this Court concluded a "Trust Agreement" was insurance because it "was designed to accept contributions from [its members], pool and invest those contributions, pay claims from each [member's] contributions, and, to the extent claims exceeded [that member's] contributions, pay the excess from pooled assets [from all members] and any income generated by those assets." *Scott,* 404 S.W.3d at 877.

In light of these examples, we examine the storage unit contract addendum which looks nothing like these products.

The storage unit contract addendum, by its very nature, is not original or independent of another obligation; it is annexed to and dependent upon the storage unit rental agreement, without which it would have no purpose. The storage unit contract addendum fails to satisfy the criterion of an original and independent obligation. Therefore, it fails to satisfy these elements that, in part, constitute a contract of indemnity; again, it simply waives a portion of the exculpatory provision of the base contract.

Appellant has characterized the addendum as a waiver of the exculpation contained in the base contract, a form of risk-of-loss provision. We do not perceive this characterization to be a mere ruse to camouflage an unauthorized insurance product. It is sufficient for our analysis that: (1) the law leaves open the possibility that either the storage unit owner or his customer ultimately will be found liable for damage to the contents of a storage unit, depending on the underlying facts of a particular claim; (2) an exculpatory provision affects the relative liability of parties to a contract; (3) a provision waiving an exculpatory provision does the same thing, but in a different way, each provision being generally a kind of risk-of-loss contract provision, and (4) given the "broad public policy of freedom of contract in Kentucky[,]" *United Services Auto. Ass'n v. ADT Sec. Services, Inc.,* 241 S.W.3d 335, 342 (Ky. App.2006), the parties to these contracts enjoy the freedom to negotiate and execute such provisions as they perceive to be in their own best interests.[7] These are also sufficient reasons for either party to

---

**7.** Though the enforceability of the original contract provision exculpating the operator is not an issue in this case, we note our Supreme Court's statement that, "[r]ecognizing the importance of freedom to contract, the courts of this Commonwealth have traditionally enforced exculpatory provisions unless such enforcement violates public policy." *Cumberland Valley Contractors, Inc. v. Bell County Coal Corp.,* 238 S.W.3d 644, 650 (Ky. 2007).

procure insurance to cover their own respective risks, allocated as they are. The record reflects that insurance is available to self-storage customers, but that not many purchase it. The record also shows that insurance is available to protect self-storage facilities operators to cover the risk they face when a customer's property is damaged. The CLIP product the Department approved in 2003 is an example.

Other hallmarks of insurance products are simply absent in this case. For example, with an insurance contract, "the insurer agrees to indemnify the insured for any loss resulting from a *specific event.*" *Buck Run Baptist Church*, 983 S.W.2d at 504 (emphasis added). The focus of insurance coverage is on events, or as the industry generally regards them, "occurrences." *See Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, 306 S.W.3d 69, *passim* (Ky.2010). That was so in *Reinhold* and *Scott, supra*, but it is not so here.

This addendum does not focus on occurrences, but solely on the operator's conduct. Many "occurrences"—events causing damage to the customer's property— will have no impact on the operator because the addendum only comes into play when the *operator* causes damage to the stored property. And if he does cause damage, and if he has not insured that risk, he will be reaching into his own profits to pay the loss.

Furthermore, there is an incongruity this Court must embrace if we are to agree with the Department that the addendum is insurance. The incongruity is that the same contract language that *establishes* (or more accurately re-establishes) the operator's risk of liability also *insures* that risk. We think it illogical to rule that the addendum does both. Since we rationally cannot avoid concluding that the purpose and effect of the addendum is to allocate risk created by the storage rental agreement, we must, *a fortiori,* conclude that this same addendum cannot also insure the customer against that risk. If we concluded that it can, we would be acknowledging the propriety of a product that protects an insured only from wrongful acts committed by the insurer himself—that's an "insurance" product not unheard of, but one most commonly associated with organized crime and often prosecuted as extortion.[8]

That brings us to another element of insurance—the risk pool. When it comes to risk, "[a]n insurer expects losses" but, rather than bear the losses itself, the insurer "spread[s the losses] through the market by means of a premium." *Buck Run Baptist Church*, 983 S.W.2d at 504– 05. For the Department's determination to be correct, this addendum itself, not the insurance product the Department unquestionably approved, would have to spread the risk of each storage unit customer's loss among all storage unit customers. *Reinhold*, 325 S.W.3d at 277 ("insurance contracts shift risk between policyholders"); *see also Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 211, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) ("spreading of risk [is] an indispensable characteristic of insurance" as is "the concept [that] 'insurance' involves some *investment* risk-taking on the part of the company [the alleged insurer]"; quoting, in part, *SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 71, 79 S.Ct. 618, 622, 3

---

8. Referring to this kind of "insurance," an observer of Mafia activity near Palermo said, "It was already whispered in town that shopkeepers were paying 'insurance' to certain 'men of reputation.' " This line is from Mario Puzo's *The Sicilian,* a fictionalized account of the real life exploits of Salvatore Giuliano (1922–1950), who was involved with the Mafia on the island of Sicily after World War II. Mario Puzo, *The Sicilian* 50 (Random House 1984).

L.Ed.2d 640 (1959); emphasis added). This distribution of the risk across the pool of "insureds" is an essential element of insurance. *Reinhold,* 325 S.W.3d at 277–78. The addendum simply does not have that effect.

By the terms of the addendum, if the property of a storage unit customer is damaged or destroyed, the parties will first have to determine whether the damage was the result of the operator's actions. If it was not, the loss will be borne by the customer.[9] If it was, the loss will be allocated between the customer and the operator in accordance with the terms of the rental contract, including the addendum; there is no shifting of risk to or liability owed by any other unit renter.

Would the Department claim a pool existed if a single operator rented a single unit to one renter under these same contract terms, including the addendum? Can a pool of one exist? That rather defies logic. So then, would renting to two customers create a pool? How many customers would it take before the Department concluded that an insurance pool existed? We are not persuaded that a pool exists by the mere fact that operators contract with multiple customers. Frankly, we have to ask what real insurer would consider it wise to create a pool of insureds so physically proximate to one another that the insurer's own negligence (for nothing else is "insured" here) could result in simultaneous claims from every member of the pool? If " 'insurance' involves some *investment* risk-taking on the part of the" insurer, *Variable Annuity,* 359

U.S. at 71, 79 S.Ct. 618 (emphasis added), an insurer who consciously did that would surely be sabotaging his success.

We cannot conclude that a pool exists, for purposes of determining this contract provision to be insurance, simply because a storage unit operator contracts with multiple customers. We know that similar risk-of-loss shifting clauses are used in other industries, with large customer bases, without the concern that a risk pool is created or an insurance product is being sold. For example, in *United Services Auto. Ass'n v. ADT Sec. Services, Inc.,* we considered a contract clause similar to that in issue here. It was contained in a home security contract ADT offered its customers. The clause said,

> If the Customer desires ADT to assume a greater liability, ADT shall amend this agreement by attaching a rider setting forth the amount of additional liability and the additional amount payable by the Customer for the assumption by ADT of such greater liability provided, however that such rider and additional obligation shall in no way be interpreted to hold ADT as an insurer.

241 S.W.3d 335, 338–39 (Ky.App.2006). The issue before us in *United Services* was the conscionability of the clause, not whether it constituted an insurance product.[10] However, the case is noteworthy as supporting the appellant's argument that even when the nature of the industry is such that one vendor contracts with numerous vendees, each contract still stands on its own and the parties to each contract

---

9. Of course, some third party may be liable ultimately. The customer may even be among the 1–2% who purchase insurance to cover such risks since nothing prohibits a customer from both purchasing that insurance and paying additional rent for the operator's waiver of exculpation.

10. If we were to find the addendum at issue in this case to be insurance, our opinion would apply to all such clauses as there is little or nothing substantively to distinguish them. There would be no reason for the Department to restrain itself from investigating ADT and other businesses that utilize such clauses.

can negotiate that contract, term-by-term, consistent with the "broad public policy of freedom of contract in Kentucky[.]" *Id.* at 342.

To better illustrate our understanding of the true purpose and effect of this provision, let us consider how the Department's argument must fail if, instead of appending this addendum to its existing contract, the operator redrafted the entire contract, amending the exculpatory language of the base contract to incorporate the intent of a contract amended by the addendum at issue, and tweaking the rent charged. There would be no addendum and no additional rent; all would be addressed in the original base contract. Would the Department still say the rental agreement constituted a contract of insurance? We do not see how.

Nevertheless, the Department has another argument for claiming a pool exists and that this addendum is insurance. It argues that a risk pool exists by virtue of the fact that when the storage operator purchases the CLIP to cover his potential losses arising under the contract and addendum, he is "reinsuring" his risk. But this argument is like a dog chasing its tail. Reinsurance enables one insurer—called the ceding insurer or reinsured—to cede all or part of the risk it underwrites to another insurer—the reinsurer. KRS 304.5–130. But before the appellant can be a reinsurer, the operator must be a ceding insurer, and before the operator can be a

ceding insurer, it must first be an insurer. The Department has not convinced us that each storage unit operator, as the purveyor of the contract provision,[11] is an insurer. Consequently, this argument must also fail.

Having considered this record, the parties' arguments, and Kentucky insurance law, we cannot agree with the Department that the provision in question, alone or in conjunction with the insurance that appellant offered to operators (or the separate insurance contract offered to customers for that matter) constituted an insurance product. In so concluding, we follow the guidance of *Reinhold:*

> [W]hether a contract is one of insurance is to be determined by a consideration of the real character of the promise or of the act to be performed, and by a consideration of the exact nature of the agreement in light of the occurrence, contingency, or circumstances under which the performance becomes requisite, and not by what it is called.

*Id.* at 277 (quoting 43 Am.Jur.2d *Insurance* § 4 (1982) (footnotes omitted)). We conclude that the real character of the promise and exact nature of the agreement in question is that of a common risk-of-loss provision, a waiver of a portion of the exculpatory provision of the base contract.

In summary, we conclude that the CSPP is not a contract of insurance.

---

**11.** The storage unit operators clearly are the purveyors of the risk-of-loss provision and not the appellants. Not only is this logical, there is no contraindication in the record, and it is necessary to the Department's reinsurance argument since the same insurer cannot be both the ceding insurer and the reinsurer. The appellant merely proposed the language that operators could employ, or not employ, to offer customers added value, and that customers could elect to negotiate and accept, or not. While the program was designed to mend the reputation of storage-unit operators and the industry, we realize that the appellant knew the CSPP would result in increased risk exposure for which the appellant then could market and sell more insurance to operators. But that is simply free enterprise, and very different from Reinhold's attempt to build an independent business, "Medi–Share," possessing all the attributes of an insurer, yet claim exemption from regulation by the Department. *Reinhold, passim.*

## B. Implicit approval of the CSPP

The appellant also contends the Department was not permitted to halt the offering of the CSPP without first withdrawing approval of the CLIP in accordance with KRS 304.12–130.[12] More specifically, the appellant suggests the Department's 2003 approval of the CLIP constituted implicit approval of the CSPP as an insurance product; therefore, the Department cannot declare the CSPP an unauthorized contract of insurance without first revoking its approval.

However, we need not further consider the appellant's argument for two reasons.

First, it appears the argument was not preserved. The appellant did not request that the Department make a finding concerning the withdrawal of approval of the CLIP before disallowing the sale and promotion of the CSPP. "Failure to raise an issue before an administrative body precludes a litigant from asserting that issue in an action for judicial review of an agency's action." *Personnel Bd. v. Heck,* 725 S.W.2d 13, 17 (Ky.App.1986) (citation omitted). We are not obligated to consider this basis of appeal.

Second, and more importantly, our determination that the CSPP is not a contract of insurance makes the argument moot.

## IV. Conclusion

The determination by the Kentucky Department of Insurance that the CSPP, an addendum to a form storage unit rental agreement that waived a portion of the exculpatory clause of the base agreement, constituted a contract of insurance was an erroneous interpretation of law. We hereby reverse the Franklin Circuit Court's December 1, 2011 Opinion and Order, and remand to the circuit court with instruction to enter an order vacating the Ken-

tucky Department of Insurance's final order of November 8, 2010.

ALL CONCUR.

---

12. KRS 304.14–130 identifies the bases upon which approval may be withdrawn, but does not specify the procedural steps the Department must take to do so.